IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs August 2, 2016

# IN RE DUSTIN T.,[1] ET AL.

**Appeal from the Circuit Court for Bradley County**
**No. V-15-476          J. Michael Sharp, Judge**
_____

## No. E2016-00527-COA-R3-PT-FILED-NOVEMBER 17, 2016
_____

The Department of Children's Services ("DCS") filed a petition to terminate the parental rights of the mother and father to their three children. The father was incarcerated in Georgia when the children were determined to be dependent and neglected, and the mother tested positive for illegal drugs and had illegal drugs and drug paraphernalia in her home when the children were removed. DCS developed three permanency plans over the course of eighteen months, with responsibilities set out for each parent. When it appeared that neither parent was in substantial compliance with the third plan, DCS filed a petition to terminate their rights. The trial court found the evidence clearly and convincingly supported the grounds DCS alleged for terminating the parents' rights and determined it was in the children's best interest that their parents' rights be terminated. Both the mother and father appeal the termination. We affirm the trial court's judgment.

## Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed

ANDY D. BENNETT, J., delivered the opinion of the court, in which CHARLES D. SUSANO, JR., J., joined. J. STEVEN STAFFORD, P.J., W.S., filed a dissenting opinion.

Wilton Marble, Cleveland, Tennessee, for the appellant, April L. T.

L. Ashley Gaither, Cleveland, Tennessee, for the appellant, Chad T.

Herbert H. Slatery, III, Attorney General and Reporter, and Brian A. Pierce, Assistant Attorney General, for the appellee, State of Tennessee, Department of Children's Services.

---

[1]This Court has a policy of protecting the identity of children in parental termination cases by initializing their last names and those of their parents.

# OPINION

## I. FACTUAL AND PROCEDURAL BACKGROUND

April L. T. ("Mother") and Chad T. ("Father") are the parents of Dustin T., Kaden T., and Katelyn T. (together, "the children"), who were born in 2007, 2008, and 2009, respectively. DCS received a referral on August 14, 2013, that the children were unsupervised and that they were exposed to illegal drugs and domestic abuse. DCS responded the following day with a police officer, whom Mother admitted into the residence and who found a methamphetamine pipe as well as several small packages of hydrocodone and Xanax. Mother was charged with possession of schedule III and schedule IV narcotics for resale and possession of drug paraphernalia.[2] Mother agreed to undergo a hair follicle test. Based on Mother's suspected drug use and the results of the hair follicle test, DCS filed a petition for temporary legal custody of Dustin T., Kaden T., and Katelyn T. Father was incarcerated in Georgia when the petition was filed.

The Bradley County Juvenile Court issued a protective custody order on August 26, 2013, based on Mother's drug use and Father's unavailability. The children were adjudicated dependent and neglected by a magistrate in October 2013, and that determination was affirmed by the Bradley County Juvenile Court in 2014. The children were placed together in a foster home, where they have remained throughout the pendency of this case.

Three permanency plans have been entered in this case. The first permanency plan, dated September 12, 2013, had the goal of returning the children to Mother's custody. Mother acknowledged and signed the plan on December 4, 2013. The plan was sent to Father at the correctional facility where he was then incarcerated. Father received the first plan, signed it on December 9, 2013, and returned the page bearing his signature to DCS. The plan included a goal target date of March 12, 2014, and it included the following parental responsibilities for Mother:

> 1. Signing all required releases for DCS to ensure proper case management;
>
> 2. Obtaining an alcohol and drug assessment and following all recommendations;
>
> 3. Not being around those who abuse or use illegal drugs;

---

[2]Mother alleged the hydrocodone and Xanax were for her personal use, but she failed to produce a prescription for either of these drugs.

4.      Submitting to random drug screens;

5.      Not being in possession of any illegal substance or drug paraphernalia;

6.      Making sure the children are supervised by an appropriate and sober adult at all times;

7.      Following all local, state, and federal laws;

8.      Being informed of any medical or dental appointments for the children;

9.      Taking only medications that are prescribed for her;

10.     Participating in individual counseling and following all recommendations;

11.     Participating in any educational meetings held for the children;

12.     Providing DCS with proof of legal income;

13.     Providing DCS with a copy of a current and valid driver's license, car insurance, and vehicle registration;

14.     Maintaining residential stability for a minimum of six months;

15.     Contacting the family service worker with any change of circumstance within twenty-four hours; and

16.     Providing DCS with a copy of rental/lease agreement.

Father's responsibilities were nearly identical to Mother's. His responsibilities did not include the items listed at numbers 9 and 10, above, and he was required to resolve all pending legal matters. Mother signed a statement on December 4, 2013, indicating that she understood her responsibilities under the permanency plan, and Father signed the same statement indicating he understood his responsibilities on December 9, 2013.

A second permanency plan was developed in March 2014 and signed by Mother the following month.[3] Mother's and Father's responsibilities under the second plan were

---

[3]Father was still incarcerated when the second permanency plan was developed. Father was represented by counsel by this time, and Father's counsel attended the child and family team meeting

the same as in the first permanency plan, and the overall goal was again to return the children to Mother's custody. When neither Mother nor Father satisfied their responsibilities by the date set forth in the second permanency plan, a third permanency plan was developed that was dated September 24, 2014. Unlike the first two plans, the third plan added the goal of adoption to the goal of returning the children to one or both parents. The third plan increased Mother's responsibilities to include the requirements that Mother pay child support as ordered and that Mother call the children as scheduled. Mother participated by phone in the meeting when the third permanency plan was developed, and her attorney signed off on the terms of the plan. Father did not participate in the development of the third plan, but he was in court when this plan was ratified on October 2, 2014.

Father was incarcerated for all but four months of the time during which the children were in foster care. The record includes documents indicating Father pled guilty to the following felonies that occurred in May and September 2006: multiple counts of burglary other than habitation; theft of property valued between $1,000 and $10,000; burglary other than habitation; conspiracy to commit burglary; and aggravated burglary. Father was sentenced to serve ten years, but his sentence was suspended and he was placed on probation on December 10, 2007. In 2013, Father was pulled over by a police officer in Georgia and charged with driving without a driver's license and evading arrest. Father was incarcerated in Georgia when the children were determined to be dependent and neglected and placed into State custody. He spent nine months in prison in Georgia, and while he was there, Father completed two courses called "Motivation for Change" and "Active Parenting Now" in an effort to improve his parenting skills. He was able to speak with the children a few times while he was incarcerated in Georgia.

After being released from prison in Georgia, Father was held in South Carolina in the spring of 2014 on a charge for grand larceny dating from 2006. Father was found not guilty of that charge and was released on May 21, 2014. Father turned himself in to the authorities in Tennessee when he realized warrants were out for his arrest, and he returned to prison on September 2, 2014, to complete his sentence dating from 2006 and 2007. During the four months he was out of prison, Father did not contact DCS or attempt to visit his children.

A probation revocation order shows that Father's probation in Tennessee was revoked in 2015 due to his leaving the State without permission, absconding supervision, committing a felony in Georgia, and being indicted for additional felonies in Bradley County. It is not clear when Father may be released from prison. He was incarcerated when this case was tried in October and November 2015.

---

when the plan was developed.

- 4 -

Turning to Mother, the record shows that she failed to comply with several provisions of the permanency plans.  Mother was arrested in January 2015 for driving on a suspended license and pled guilty to two counts of the same offense.[4]  Mother was also arrested that same month for an incident involving public intoxication and domestic violence.  At the time of trial, Mother was incarcerated as a result of her failure to pay the fines imposed in 2014 resulting from when she was charged and convicted for the felonies of possession of schedule IV drugs and possession of schedule III drugs for resale, and the misdemeanor of possession of drug paraphernalia, which occurred when the children were placed into the State's custody.

One of the requirements of the permanency plans was that Mother provide DCS with proof of legal employment.  During the pendency of this case, Mother provided DCS with only three pay stubs, each from a different employer.  According to Mother's testimony, she was employed by several different employers during this time period, but she failed to provide proof of other employment.  Mother was also required to maintain residential stability for a period of six months and provide DCS with a copy of a rental or lease agreement.  The proof showed that Mother had a month-to-month rental agreement for a house in Etowah, Tennessee beginning in July 2014, but she was evicted in April or May of 2015 due to her failure to pay the rent.  She testified at trial that she is currently living with her brother and not paying any rent.

The permanency plans require Mother to keep DCS informed of any change in circumstances within twenty-four hours.  Mother has failed to keep DCS informed of her change in telephone numbers, her changes in employment, or her changes in residence in a timely manner.  Kim Ash is the family service worker assigned to this case, and Ms. Ash testified that she has spent a lot of time throughout the pendency of this case attempting to contact Mother by phone for various children's appointments, child visits, counseling, random drug sampling, and court hearings, and she has driven out to Mother's various residences when she cannot reach Mother by phone in an effort to locate her and provide her with relevant information.

Petition to Terminate

DCS filed a petition to terminate Mother's and Father's parental rights on June 23, 2015, approximately twenty-two months after the children were removed from the parents' house.  The petition cited four statutory grounds for the termination of their rights:  abandonment by showing wanton disregard for the children's welfare by Father (Tenn. Code Ann. §§ 36-1-113(g)(1) & 36-1-102(1)(A)(iv)); substantial noncompliance with the permanency plans (Tenn. Code Ann. § 36-1-113(g)(2)); abandonment by Mother for failure to support the children in the four months immediately preceding the filing of

---

[4]The family service worker, Kim Ash, testified that Mother continued to drive with a suspended driver's license even after she was convicted for this offense.

the petition (Tenn. Code Ann. §§ 36-1-113(g)(1) & 36-1-102(1)(A)(i)); and persistent conditions (Tenn. Code Ann. § 36-1-113(g)(3)).

The trial occurred on October 13 and November 4, 2015, and testimony was offered by the following individuals: Mother; Father; Ms. Ash; Pat Vasterling, who was an investigator for Child Protective Services and is the one who removed the children from Mother's custody in August 2013; Judith Coffman, who is a probation officer; Tamara Lively, who was the clinical therapist for the children; and both of the children's foster parents. The trial court issued a comprehensive ruling on February 29, 2016, in which it ruled that the State had proven by clear and convincing evidence all the grounds alleged for terminating Mother's and Father's parental rights and that it was in the children's best interest for Mother's and Father's rights to be terminated.

Trial Court's Findings of Fact

The court's findings of fact regarding Father included the following:

[Father] testified that he was aware that his children were in foster care and that this case was filed and monitored in Bradley County Juvenile Court . . . . He admitted that while he was at liberty and living in Bradley County for almost four months, he never called the Bradley County Department of Children's Services Office to inquire about the status of his children, the name of his family case manager and/or how to arrange for visitation with his children. [Father] turned himself in to the Bradley County Sheriff's Department on September 2, 2014 pursuant to several warrants for charges which had been issued prior to his Georgia incarceration. He has remained incarcerated in the Bradley County jail since that date. On April 27, 2015, the Bradley County Criminal Court revoked his probation on several charges and imposed a ten (10) year sentence which had been suspended since December 10, 2007 when he was found guilty of numerous burglaries and thefts. That probation revocation order found that [Father] had violated the conditions of his probation by leaving the State without permission, absconding supervision, a new felony conviction in Georgia and new felony indictments in Bradley County, Tennessee. [Father] was committed to the custody of the Tennessee Department of Corrections for ten (10) years with credit for eighteen months and twenty days "time served" as of that date. . . . [Father] testified that he hopes to be released on parole during January 2016, however, with more than eight years remaining on his sentence, after serving only 30% of that balance, he might not be eligible for parole until August 2017.

- 6 -

Then, with regard to Mother, the trial court found, *inter alia*, the following:

On October 13, 2015, Family Service Worker, Kimberly Ash (hereinafter referred to as FSW Ash), testified that during the late Spring and Summer of 2014, [Mother] began to comply with the requirements set out in all three of the Family Permanency Plans in this case, however her compliance lasted for only a few months.

During July 2014 [Mother] became employed at Waupaca Foundry and obtained a Month-to-Month rental agreement for a residence located in Etowah, Tennessee. After FSW Ash arranged for in-home services which began in May 2014, [Mother] completed an Alcohol and Drug treatment program on July 22, 2014 and she participated in domestic violence victim counseling which Health Connect America provided for her at her residence.

On July 24, 2014, the Bradley County Juvenile Court ordered [Mother's] visitation to be supervised by a therapeutic visitation provider due to a breakdown between her and the foster mother. . . . [Mother] received regularly scheduled supervised visits from October through December 2014. FSW testified that during this time [Mother's] telephone contact with the children became sporadic and unreliable, and the children frequently attempted to reach their mother when she didn't call as expected. FSW Ash testified that usually they were not successful in reaching her. FSW Ash also testified that she had difficulty reaching [Mother] by telephone. FSW Ash attempted to leave numerous messages on [Mother's] phones. The latest phone number that she provided was frequently devoid of service and it had no voice mail available as her previous number provided. That prior phone service was deactivated. FSW Ash testified that [Mother] was slow and irregular about returning calls from Ms. Ash. The case manager attempted to reach [Mother] by leaving messages with her brother and other relatives, including her mother-in-law. It was finally [Father's] mother who was able to track her down when FSW Ash was urgently trying to reach her to provide consent for ear surgery that Katelyn needed.

The children's clinical therapist, Tamara Lively, testified that [Mother] attended family counseling with the children [for] approximately four weeks beginning in July until the end of August, 2014. After the four sessions, but before the counselor determined that the trust issues the children were having with their mother had been addressed, [Mother] called (when a session was already scheduled to begin and the children were sitting in the counselor's office) to say she was not able to attend due to

- 7 -

what she claimed was a work schedule conflict. She was notified of two or three more family sessions that were scheduled by Omni Community Health, however [Mother] failed to attend and she failed to call to explain her absence at these sessions.

On September 19, 2014, [Mother] pled guilty and received two concurrent two-year sentences which were suspended with a Two thousand ($2,000.00) dollar fine for each of the charges of Possession of Schedule III Drugs for Resale and Possession of Schedule IV Drugs for Resale. She remains on probation for those convictions. Probation Officer Judith (Jill) Coffman testified that, to date, [Mother] has paid only ninety ($90.00) dollars toward her probation fees and fines. She currently owes Five thousand, Six hundred Ninety-one ($5,691.00) dollars in fees and fines to Bradley County Criminal Court. Officer Coffman stated that she has not filed a violation for failure to pay fines and fees yet. However, Officer Coffman testified that [Mother] is in violation of her probation requirements. [Mother] has reported once per month, however the officer noted that [Mother] has never complied with the date/time requirements when she was scheduled to report. Officer Coffman testified that "She gets around to it on her own schedule, usually by the end of each month." Again, Officer Coffman testified that [Mother] is currently in violation of her probation requirements.

. . . .

During October 2014 [Mother] was arrested in McMinn County for two charges of Driving on a Suspended License. On January 28, 2015, she pled guilty to both of those charges . . . and received a six month sentence suspended with a Sixty-five ($65.00) fine to pay for each count.

On November 18, 2014 [Mother] was terminated from her employment at Waupaca Foundry. She did not inform her case manager of this change of status until several weeks later. [Mother] testified that she quit the job at Waupaca due to sexual harassment by her supervisor. However, that claim was investigated and found not to be substantiated by the Waupaca human resource department. The Separation Notice obtained from [Waupaca] is as follows: "[Mother] quit after signing a last chance agreement, she was given multiple chances to reconcile her attendance after violations to the company attendance policy effective 11/19/14." The court takes judicial notice of the fact that [Mother] was actually given three "last chance" opportunities with Waupaca and still was terminated, apparently due to her ongoing problems with her work attendance and/or attitude.

On January 20, 2015, [Mother] was arrested in Polk County, Tennessee, with at least two other individuals . . . . She was initially charged with domestic assault, public intoxication and disorderly conduct. [Mother] testified that the domestic assault and public intoxication charges were dismissed and she was found guilty of disorderly conduct and released after a few hours in the Polk County Jail. She paid a twenty-five ($25.00) dollar fine. . . .

Based upon [Mother's] testimony, she has worked for six employers since the children were removed from her custody and she has not been unemployed for significant periods between these jobs. However, she provided only one pay period wage statement from three of these employers . . . . In addition to these three jobs, she states that she worked "for cash" without pay records at Horner Construction and Stanley Stonework. She also testified that . . . she is currently employed by L and J Manufacturing. When the court re-opened the proof, the court also inquired as to any change in [Mother's] employment status and/or housing status. The court has now been informed by [Mother's] attorney that she is no longer employed by L and J Manufacturing, but is now employed by an entity known as ABC One Two Three in Calhoun, Tennessee. Again, the court takes judicial notice of another job change for [Mother]. However, no documentation was provided to the Department nor to this Court regarding these "cash" jobs and current employment. The court has great questions regarding [Mother's] credibility as to the issues of her employment history and current job status.

. . . .

[Mother] was incarcerated during the first day of this Termination of Parental Rights trial. She asserted that her misdemeanor probation had been violated because she was not able to pay Twelve hundred ($1,200.00) dollars within six months from the entry of the judgment. Upon review of the certified copies of those misdemeanor orders, the only fines which were imposed by the McMinn County General Sessions Court on January 28, 2015 was Sixty-five ($65.00) dollars on each of the two charges, totaling One hundred Thirty ($130.00). [Mother] stated that she tried to pay her probation fines and fees, but she had too many other expenses to comply with the requirements of her probation. Again, the court has great question regarding [Mother's] credibility as to this issue.

The trial court found Ms. Ash to be a credible witness and based on her testimony, determined by clear and convincing evidence that both Mother and Father were substantially in noncompliance with the family permanency plans.

<u>Trial Court's Conclusions of Law</u>

The trial court found that before Father was incarcerated, he "exhibited a wanton disregard for the welfare of his children" and that the evidence showing his wanton disregard was established by clear and convincing evidence. The court wrote:

> [H]is children were eight years old and younger when he was committed to serve his ten year sentence, which was previously suspended. His probation was revoked due to his continued criminal activity and violation of probation rules. [Father] has a long and ongoing criminal history. [Father's] criminal behavior has prevented him from being a custodian for his children and has limited the Department's ability to work with [Father] to assist him in becoming a proper custodian for the children. The court finds that [Father] never attempted to have contact or visits with his children during the four months that he enjoyed freedom in Bradley County during 2014 and while they were in foster care.

Turning to the ground of persistent conditions, the trial court found that the children were initially brought into the State's custody due to the presence of drugs in the family home that were packaged for resale along with drug paraphernalia, Mother's positive drug screen, and Father's inability to parent due to his incarceration. During trial, the court took judicial notice of the fact that Father was incarcerated at the time of trial and will continue to be incarcerated for the foreseeable future.

With regard to Mother, the court noted that she had completed alcohol and drug treatment but that she continued to associate with known drug users. The court found that Mother did not have stable housing, which increases the likelihood that the children will be neglected if they are returned to her care in the near future. The court also found Mother was financially unstable and unable and/or unwilling to maintain consistent legal employment, and that she had been "very sporadic in maintaining contact with the children." Further, the court found that Mother was on State probation and had failed to comply with the financial requirements to maintain good standing in her probation matters; she was at risk of incarceration due to her violation of probation, which would expose the children to further neglect and return to foster care; and that Mother "showed little, if any, care or concern regarding her violation of her probation requirements" at trial.

With regard to the ground of substantial noncompliance with the permanency plans, the court wrote, *inter alia*:

> The permanency plans in this case listed a number of requirements that the Respondents need to satisfy before the children could be safely returned home. The Bradley Juvenile Court ratified these Permanency Plans on

February 6, 2014, and October 2, 2013, as in the children's best interest and were reasonably related to the reasons for foster care. . . . The court finds that [Mother] has not substantially complied with the responsibilities and requirements set out in the permanency plans. She has not maintained stable housing and income. She has continued to incur criminal charges and has remained inconsistent with visitation and phone calls with the children. The court finds that she failed to follow through with individual counseling after the in-home services were exhausted. The court further finds that she failed to maintain contact with the Department. Furthermore, the court finds that she has continued to associate with known drug users. All of these findings have been proved by clear and convincing evidence.

The court also found Father had not substantially complied with the requirements that applied to him in the permanency plans:

He has not completed any tasks as set out in the plans other than the programs that he attended while incarcerated in Georgia. Following his release from Georgia, he went back to jail on additional felony charges and a revocation of his probation for a ten year sentence. He has not contacted the Family Services Worker to inform her of changes in his location and/or incarceration status. He has not continued to maintain contact with the children by writing or calling. All of these findings have been proven by clear and convincing evidence.

The court then addressed the ground against Mother of abandonment by failing to support the children:

The court finds that [Mother] was ordered to pay child support for these three children in December 2014. The court finds that for the four months prior to the filing of this Petition, from March 22, 2015, until July 22, 2015, [Mother] made no payments despite having various jobs and producing income during that period. The court finds that [Mother] is healthy and has the ability to work and to hold stable and consistent employment, however, by her own actions and her personal choices, she has been unwilling to do what is necessary to maintain ongoing stable employment. The only payment that was applied toward [Mother's] obligation to support these children prior to the date that the Petition was filed was a federal Income Tax Refund Intercept, receipted March 6, 2015. The court finds that the tax intercept is not a voluntary payment of support.

The trial court then considered the children's best interest and ruled that the evidence was clear and convincing that terminating both Mother's and Father's rights was in the children's best interest.

Both Mother and Father appeal the trial court's judgment terminating their rights. Father does not contest the court's determination that statutory grounds exist for terminating his rights. His argument is limited to the court's best interest analysis. Mother appeals the court's ruling on both the statutory grounds and best interest analysis. She also contends the court impermissibly relied on hearsay in reaching its decision to terminate her rights.

## II. ANALYSIS

### A. Standard of Review

The standard for appellate review of parental termination cases was recently reiterated by the Tennessee Supreme Court:

> An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness.

*In re Carrington H*., 483 S.W.3d 507, 523-24 (Tenn. 2016) (citations omitted), *petition for cert. filed sub nom. Vanessa G. v. Tenn. Dep't of Children's Servs*., No. 15-1317 (U.S. Apr. 27, 2016).

The termination of a parent's rights is one of the most serious decisions courts make. As the United States Supreme Court has said, "[f]ew consequences of judicial action are so grave as the severance of natural family ties." *Santosky v. Kramer*, 455 U.S. 745, 787 (1982). Terminating parental rights has the legal effect of reducing the parent to the role of a complete stranger, and of "severing forever all legal rights and obligations of the parent or guardian." Tenn. Code Ann. § 36-1-113(l)(1).

A parent has a fundamental right, based in both the federal and state constitutions, to the care, custody, and control of his or her own child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *Nash-Putnam v.*

- 12 -

*McCloud*, 921 S.W.2d 170, 174-75 (Tenn. 1996); *In re Adoption of a Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995). While this right is fundamental, it is not absolute. The State may interfere with parental rights only in certain circumstances. *In re Angela E.*, 303 S.W.3d at 250. Our legislature has listed the grounds upon which termination proceedings may be brought. *See* Tenn. Code Ann. § 36-1-113(g). Termination proceedings are statutory, *In re Angela E.*, 303 S.W.3d at 250; *Osborn v. Marr*, 127 S.W.3d 737, 739 (Tenn. 2004), and a parent's rights may be terminated only where a statutory basis exists. *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In the Matter of M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998).

To terminate parental rights, a court must determine by clear and convincing evidence the existence of at least one of the statutory grounds for termination and that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010) (citations omitted). Unlike the preponderance of the evidence standard, "[e]vidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable." *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005).

Once a ground for termination is established by clear and convincing evidence, the trial court or the reviewing court conducts a best interests analysis. *In re Angela E.*, 303 S.W.3d at 251 (citing *In re Marr*, 194 S.W.3d 490, 498 (Tenn. Ct. App. 2005)). "The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." *Id.* at 254. The existence of a ground for termination "does not inexorably lead to the conclusion that termination of a parent's rights is in the best interest of the child." *In re C.B.W.*, No. M2005-01817-COA-R3-PT, 2006 WL 1749534, at *6 (Tenn. Ct. App. June 26, 2006).

B. Grounds Supporting the Termination of Father's Rights

We will first review the trial court's determination that grounds exist to terminate Father's rights to the children. The statutory grounds supporting the trial court's decision with regard to Father include (1) abandonment by engaging in conduct prior to incarceration that exhibits a wanton disregard for the children's welfare, Tenn. Code Ann. § 36-1-113(g)(1) and § 36-1-102(1)(A)(iv); (2) substantial noncompliance with the permanency plans, Tenn. Code Ann. § 36-1-113(g)(2) and § 37-2-403(a)(2); and (3) persistent conditions, Tenn. Code Ann. § 36-1-113(g)(3). Although Father does not appeal the court's determination that the statutory grounds the State alleged were proven by clear and convincing evidence, we are required to "review thoroughly the trial court's findings as to each ground for termination and as to whether termination is in the child[ren]'s best interests." *In re Carrington H.*, 483 S.W.3d at 525. This is the case

even when a parent challenges only the best interest analysis on appeal. *Id.* at 524-25.

### 1. Wanton Disregard

According to Tenn. Code Ann. § 36-1-113(g)(1), a parent's rights can be terminated if a court finds that the parent has abandoned his children, as that term is defined in Tenn. Code Ann. § 36-1-102(1)(A). If a parent is incarcerated when a termination petition is filed, a court can find a parent has abandoned his children if the parent "has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child[ren]." Tenn. Code Ann. § 36-1-102(1)(A)(iv). Although "wanton disregard" is not defined in the statute, Tennessee courts have determined that "'probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child.'" *In re William B.*, No. M2014-01762-COA-R3-PT, 2015 WL 3647928, at \*3 (Tenn. Ct. App. June 11, 2015) (quoting *In re Audrey S.*, 182 S.W.3d at 867-68). Incarceration alone is not sufficient to prove abandonment, but "[a] parent's decision to engage in conduct that carries with it the risk of incarceration is itself indicative that the parent may not be fit to care for the child." *In re Audrey S.*, 182 S.W.3d at 866. In determining whether a parent has shown wanton disregard for a child's welfare, a court will consider "whether the parental behavior that resulted in incarceration is part of a broader pattern of conduct that renders the parent unfit or poses a risk of substantial harm to the welfare of the child." *Id.*

"[P]arental conduct exhibiting wanton disregard for a child's welfare may occur at any time prior to incarceration and is not limited to acts occurring during the four-month period immediately preceding the parent's incarceration." *State of Tenn. Dep't of Children's Servs. v. Hood*, 338 S.W.3d 917, 926 (Tenn. Ct. App. 2009). The record shows that Father was incarcerated in Georgia when the children were removed from the home in 2013 and that he has been incarcerated either in Georgia or Tennessee for all but four months of the time the children have been in foster care. The record includes nineteen judgments resulting from felonies committed on May 9, 2006, and on October 12, 2006, to all of which Father pled guilty. Mother was pregnant with their first child on October 12, 2006. Father's sentences were all suspended, and he was placed on probation in December 2007. Father testified that he knew he was required to refrain from incurring additional charges and that he was not permitted to leave the State if he wanted to remain on probation and avoid incarceration. However, Father chose to violate his probation by working in Georgia and driving without a license.

In or around August 2013, before the children were placed into the State's custody, Father was charged in Georgia with evading arrest in addition to driving on a suspended license, reckless driving, failure to maintain his lane, and failure to stop for a stop sign. Father pled guilty to these charges and was incarcerated in Georgia for nine

months.  At this point, the children were all under the age of seven years old.  When asked why he failed to comply with the requirements of his probation for the felonies committed in 2006, Father replied, "Things happen."  Then, when Father returned to Tennessee, he was incarcerated as a result of being in violation of his probation.  The Probation Revocation Order dated October 2, 2015, states that Father violated the terms and conditions of his probation by leaving the State without permission, absconding supervision, and incurring a new felony conviction in Georgia and new felony convictions in Bradley County.  We agree with the trial court, based on the evidence in the record, that the State has proven the grounds of wanton disregard against Father by clear and convincing evidence and affirm this finding by the trial court.

### 2.  Substantial Noncompliance

To establish the ground of substantial noncompliance with the permanency plans, the State must prove by clear and convincing evidence that Father has not substantially complied with the statement of responsibilities set forth in the permanency plans at issue.[5]  Tenn. Code Ann. § 36-1-113(g)(2).  The trial court tracked the requirements set forth in the plans, insofar as they applied to Father, and found as follows with respect to his noncompliance:

> 1.  [Father] has not signed any releases.  2.  [Father] has not completed any Alcohol and Drug Assessment or treatment.  3.  The Department does not know who [Father] is associating with at Bradley County Jail.  4.  [Father] has not been available to submit to random drug screens due to his incarceration.  5.  The Department has no current information about whether these parents have possessed illegal substances or drug paraphernalia.  6. Neither parent has been responsible for the children's supervision; therefore, this requirement is not applicable. 7.  [Father] has been incarcerated during twenty three of the twenty seven months that these children have been in foster care.  His previous probation has been revoked due to continued criminal activity that occurred prior to the removal of these children. Neither parent has been responsible for the children's supervision; therefore, this requirement is not applicable.  8.  The Department has been unable to reach [Father] regarding these appointments and due to his incarceration, he could not attend any appointments.  11. [Father] has been unavailable and unable to attend any educational meetings for the children.  12. [Father] has been unable to work while he has been incarcerated.  He provided no documentation regarding any employment he held during the four months when he was at liberty during 2014. 13.  [Father] has not provided documentation regarding his driving privileges or registration and insurance on any vehicle he may own or

---

[5]See the list of Father's responsibilities enumerated on pages 2-3, *supra*.

maintain. 14. [Father] remains incarcerated and cannot provide appropriate housing for the children at this time or in the near future. 15. [Father] has not provided the family services worker any information regarding his location or other circumstances. 16. [Father] has not provided any lease/rental agreement.

Father's incarceration has prevented him from satisfying most of his responsibilities under the plans, but he could have stayed within the law, and he could have informed the DCS family service worker of changes in his location, including his incarceration status, both of which he has failed to do. The trial court found Father has failed to satisfy his responsibilities under the plans, and we find the evidence supports this finding by clear and convincing evidence. Therefore, we affirm this ruling by the trial court.

### 3. Persistence of Conditions

To establish the persistence of conditions ground for termination, the State must show the children have been removed from the parents' home for six months, the conditions that led to the children's removal, or other conditions, still persist, there is little likelihood that these conditions will be remedied at an early date to enable the children to return to the parents safely in the near future, and the continuation of the parent-child relationship diminishes the children's chances of integrating into a safe, stable, and permanent home. Tenn. Code Ann. § 36-1-113(g)(3). As the trial court noted, Father was currently incarcerated and was not in a position to parent the children. No reliable evidence was introduced showing when Father would be released from prison.[6] Because Father was not in a position to parent the children and no information was introduced indicating when he might become available, we find the State has proved by clear and convincing evidence the ground of persistent conditions against Father.

### C. Grounds Supporting the Termination of Mother's Rights

The statutory grounds supporting the trial court's decision with regard to Mother include (1) substantial noncompliance with the permanency plans, Tenn. Code Ann. § 36-1-113(g)(2) and § 37-2-403(a)(2); (2) persistent conditions, Tenn. Code Ann. § 36-1-113(g)(3); and (1) abandonment by failure to support, Tenn. Code Ann. § 36-1-113(g)(1) and § 36-1-102(1)(A)(i).

---

[6]Father testified he thought he might be placed on probation in January 2016, and the trial court reopened the proof to allow Father's attorney to provide evidence of this. However, no evidence was provided supporting Father's testimony, and as of the date of the trial court's Final Order, Father remained incarcerated.

### 1. Substantial Noncompliance

Mother contends the trial court erred in finding the State proved the ground of substantial noncompliance by clear and convincing evidence. Mother correctly points out that the requirements of the permanency plans must be reasonable and related to remedying the conditions that caused the children to be removed from the parents' custody. *See In re M.J.B.*, 140 S.W.3d 643, 656 (Tenn. Ct. App. 2004). According to Mother, the requirements numbered 1, 13, 14, 15, and 16 were not related to remedying the conditions that led to the children's removal. The requirements Mother complains about include the requirements of signing releases to enable DCS to manage the case properly; providing DCS with copies of a current and valid driver's license, car insurance, and vehicle registration; maintaining residential stability for a minimum of six months; informing the family service worker of changes of circumstance within twenty-four hours; and providing DCS with a copy of a rental/lease agreement.

Contrary to Mother's argument, we find that each of these requirements is related to remedying the conditions that led to the children's removal and/or showing Mother is in a position to regain custody of them. The children were initially removed because of their exposure to illegal drugs, inadequate supervision, Mother's positive test for illegal drugs, and her possession of illegal drugs and drug paraphernalia. The responsibilities set forth in the permanency plans are intended to help Mother live within the law and become able to provide for the children without resorting to criminal activities, such as selling illegal drugs. The first requirement is necessary to enable DCS to ensure the children's health while they are in the State's custody. If Mother did not have a car when the case began, the requirement numbered 13 would not be relevant to this case. However, Mother had a car that she drove, and evidence was introduced that she was arrested for driving without a valid license. Under the plans, Mother was responsible for following all local, state, and federal laws (requirement 7). If she is driving, Mother is required by law to possess a valid driver's license, and if she is driving her own car, the law requires Mother to register and insure the car.[7] Tenn. Code Ann. §§ 55-3-102(a)(1) and 55-50-301(a)(1). The requirements included in number 13 all relate to staying within the law, which is a responsibility about which Mother does not complain.

Maintaining residential stability is necessary to show Mother is equipped to care for her children. The evidence showed that Mother had a rental agreement for close to a year while the children were in foster care, but she ultimately was evicted from that home because she was unable to pay the rent. Although residential stability was not stated as a reason the children were initially removed, Mother must have residential stability before the children could be returned to her. One of the goals of the permanency plans was

---

[7]If Mother did not drive or own a car, she would be correct that she should not be required to possess a valid driver's license or to register and insure a car. Mother is correct that driving is not a prerequisite to having the children returned to her.

always to return the children to Mother. Thus, requiring Mother to have residential stability, which means being able to pay the monthly rental or mortgage payments, was necessary to achieve this goal.[8]

Finally, the requirement that Mother inform the family service worker of her change of circumstances is reasonably related to the reasons the children were removed. The requirement assists DCS in helping Mother stay in compliance with the law and enables the family service worker to reach Mother for issues related to the children and their welfare, as well as to check on her employment status and living situation. It also enables DCS to contact her to arrange for drug screens. The trial court found Mother's responsibilities, enumerated in the permanency plan, were reasonably related to remedying the conditions which necessitated the foster care placement, and we affirm this finding.

Mother contends the trial court relied on inadmissible hearsay in finding she was in substantial noncompliance with the permanency plans. The alleged hearsay at issue concerns some of Mother's acquaintances who were described as drug users. The evidence at issue was first introduced at the children's dependency and neglect proceedings in Juvenile Court, appears in that court's review order entered on February 18, 2015, and includes the following:

> [Mother] was arrested on January 20, 2015, in Polk County for domestic assault, public intoxication, and disorderly conduct. The domestic assault charge and public intoxication charges were dismissed, however she was convicted on disorderly conduct. [Mother] did not inform the Department of the arrest and did not report the arrest to her probation officer. [Mother] was also arrested for driving on a suspended license and failed to report this arrest to either DCS or probation as well. FSW Ash has verified that the individuals that were listed on the police report with [Mother] have histories of drug use and involvement with DCS for reported abuse and drug use. Mr. Preston Greene has been reported to be [Mother's] boyfriend, however she states that he is not and that he does not reside with her. He is on the federal methamphetamine registry.

During the trial on October 13, 2015, the court sustained all of Mother's attorney's objections to Ms. Ash's testimony regarding whether the individuals arrested along with Mother were on the methamphetamine offender registry. No other evidence was introduced at the trial regarding whether these individuals used illegal drugs. We agree with Mother that the basis for the trial court's decision to terminate her rights should not rest on her association with known drug users at the time she was arrested in January

---

[8]Mother testified she was living with her brother at the time of trial, but she did not introduce evidence showing her brother's home was a suitable residence for the children.

2015 and convicted for disorderly conduct.  This evidence is not necessary, however, to conclude that other clear and convincing evidence was sufficient to support the trial court's conclusion that statutory grounds exist to terminate Mother's rights to the children.

The trial court considered each of Mother's responsibilities under the permanency plans to determine whether she was in compliance and wrote as follows:

1.  While [Mother] initially signed releases required by the Department, she has been unavailable at crucial times to sign releases and consents for medical treatment of these children.  2.  [Mother] did complete alcohol and drug treatment when the Department provided in-home services for her.  3. The Department has no current information regarding these parents' current associations, however [Mother] was arrested during January 2015 with two persons who are known drug users.  4.  [Mother] has not been available or quickly responsive to the Department's attempts to contact her, however, when she has submitted to requested drug screens they were clear.  5.  The Department has no current information about whether these parents have possessed illegal substances or drug paraphernalia.  6.  [Mother] has not enjoyed unsupervised contact with the children since January 2015. Neither parent has been responsible for the children's supervision; therefore, this requirement is not applicable.  7.  [Mother] has been arrested for two misdemeanor charges of Driving on a Suspended License.  The FSW has seen [Mother] continue to drive without a valid driver's license. [Mother] was also arrested in Polk County for domestic assault, public intoxication and disorderly [conduct] during January 2015 and found guilty of disorderly conduct.  She continues to be on supervised State probation and she has not complied with the financial terms and requirements of that probation.  Further, she has been ordered to pay child support for these three children and has not complied with those court orders.  8.  The Department has attempted to inform [Mother] of the medical and dental appointments so that she could participate in the children's health care.  She has only attended two medical appointments for the children out of the dozens of doctor/dentist visits.  9.  The Department has no current information regarding whether [Mother] is taking her medications only as prescribed.  10.  [Mother] did participate in individual counseling when the Department provided in-home services for this counseling; she has not continued to seek individual counseling to address the issues identified in her parenting assessment.  11.  [Mother] has attended one education meeting for the children.  12.  [Mother] has provided documentation of three jobs she has held since the children have been placed in foster care. She reported that she has been employed in several other positions, however, no documentation or wage verification has been provided or

- 19 -

available to the Department. 13. [Mother] does not have a valid driver's license at this time. At one time, [Mother] provided proof of car insurance and registration, however, no proof of current registration or insurance has been provided. 14. [Mother] has not maintained residential stability for at least six months prior to the filing of this Petition. She maintained a residence from July 2014 until April 2015; however, she was evicted and has not maintained a verified residence appropriate for the children since her eviction. 15. [Mother] has never provided her family services worker with notice of change in circumstances within twenty-four hours of the change or event. 16. [Mother] has not provided the Department with a copy of any lease/rental agreement since she was evicted from her last residence.

With the exception of the trial court's reference to Mother's associations with others who are known drug users in discussing the responsibility numbered 3 under the plan, the record supports all of the findings by the trial court quoted above. Mother has satisfied some of the plans' requirements, such as completing alcohol and drug treatment, attending some of the children's educational meetings, and participating in counseling sessions. However, she has not satisfied a majority of the requirements, including following local, state, and federal laws, informing DCS about her changes of circumstance, calling the children as scheduled, or paying child support as she has been ordered to do. Although trivial, minor, or technical deviations from a permanency plan's requirements will not be deemed to amount to substantial noncompliance, *In re M.J.B.*, 140 S.W.3d at 656-67, Mother's noncompliance has been substantial. The evidence supports the trial court's finding that Mother was in substantial noncompliance with the permanency plans, and we affirm the trial court's ruling that the State established this ground by clear and convincing evidence.

### 2. Abandonment by Failure to Support

Tennessee Code Annotated sections 36-1-113(g)(1) and 36-1-102(1)(A)(i) provide that if a parent willfully fails to support or make reasonable payments toward the support of her children for a period of four consecutive months immediately preceding the filing of a termination petition, the parent will be deemed to have abandoned her children. A court must find that the abandonment was "willful" for it to be actionable. Tenn. Code Ann. § 36-1-102(1)(A)(i). To establish willfulness, in this context, a petitioner must show that "a parent who failed to visit or support had the capacity to do so, made no attempt to do so, and had no justifiable excuse for not doing so." *In re Adoption of Angela E.*, 402 S.W.3d at 640 (citing *In re Audrey S.*, 182 S.W.3d at 864); *see In re Audrey S.*, 182 S.W.3d at 863-64 (stating an individual acts willfully if he or she knows what he is doing and has the intention to do what he or she is doing). "Whether a parent failed to visit or support a child is a question of fact. Whether a parent's failure to visit or support constitutes willful abandonment, however, is a question of law." *In re Adoption*

*of Angela E.*, 402 S.W.3d at 640 (citing *In re Adoption of A.M.H.*, 215 S.W.3d 793, 810 (Tenn. 2007)). A parent will not be found to have abandoned his child if his failure to support or to visit the child is not within his control. *Id.*

The petition to terminate was filed on June 23, 2015. The State was thus required to establish by clear and convincing evidence that Mother willfully failed to support the children from February 22, 2015, through June 22, 2015. Mother testified that she was aware in December 2014 of her obligation to pay child support of $156 per month for each child in addition to an additional $5 per month per child towards the child support arrears of $2,184.00 per child. The evidence showed, however, that the total amount Mother paid in child support was $392 per child. The only child support payments Mother ever made were when money was taken out of her paychecks for this purpose in September 2015, after the petition for termination was filed, and when her tax refund was intercepted by the State in March 2015. Mother provided the foster parents with new winter coats for the children and some clothes on occasion in 2014, but no evidence was introduced that coats or clothes were supplied within four months of the filing of the State's petition.

The trial court found that even though the tax intercept occurred in the four months preceding the filing of the petition, the intercept did not constitute a voluntary payment of support by Mother. This view is supported by other cases involving similar facts. *See, e.g., In re Kadean T.*, No. M2013-02684-COA-R3-PT, 2014 WL 5511984, at *7 (Tenn. Ct. App. Oct. 31, 2014) (holding "trial court correctly concluded that the tax intercept would not be considered in determining whether Mother failed to support her child during the relevant period"); *In re Adoption of Alexander M.S.F.*, No. M2012-02706-COA-R3-PT, 2013 WL 4677886, at *5 (Tenn. Ct. App. Aug. 27, 2013) (holding tax intercept is "irrelevant to the issue of willful failure to support" and does not constitute a voluntary payment of support); *In re Alyssa Y.*, No. E2012-02274-COA-R3-PT, 2013 WL 3103592, at *10 (Tenn. Ct. App. June 17, 2013) (explaining that interception of Mother's tax refund is not relevant to determining whether Mother failed to support child).

Mother argues the State failed to show she had the ability to pay child support. However, as the trial court found, Mother testified that she was employed by several different employers during the time that the children were in foster care and she was not unemployed for significant periods between these jobs. Mother testified that she acquired a Chevrolet Cavalier at some point in 2014 and that she made irregular weekly payments of between $100 and $200 on the car. She testified that the car was registered and insured. She also testified she made weekly payments of between $20 and $50 for the fines she incurred for violating her probation. Despite the requirement in the permanency plans that Mother provide proof of her income to DCS, Mother provided only three weeks' worth of pay stubs in 2013 and 2014.

Mother knew of her obligation to pay child support during the relevant four-month period, and she did not testify that she was unable to pay any amount of child support during this time. She testified that she was paid cash when she worked for construction companies in 2015, and she admitted that she did not send any of this money to the State to satisfy her child support obligations during the four-month period at issue. At the time of trial, Mother testified she was living with her brother and that she had been there for "several months." The record does not establish whether Mother was paying any rent or utility expenses while she was living with her brother, and the "several months" period seems to include at least a portion of the four months immediately preceding the filing of the termination petition.

This is not a case where Mother made some child support payments but failed to pay the amount ordered, as was the case in *In re Adoption of Alexander M.S.F.*, M2012-02706-COA-R3-PT, 2013 WL 4677886, at *5-6 (Tenn. Ct. App. Aug. 27, 2013). In that case, the father paid about 34% of the amount he was supposed to pay, and we reversed the trial court's determination that these payments constituted "token support" under the statute. *Id.* at *6. This is more like the facts of *In re Aspyn*, M2013-00855-COA-R3-PT, 2013 WL 4677942 (Tenn. Ct. App. Aug. 27, 2013), in which the mother testified that she was employed during the four months preceding the termination petition's filing date but that she did not apply any of her employment income towards the support of her child. *Id.* at *3. In this case, Mother was employed, and she was earning enough money to make car payments, keep her car insured and registered, and pay fines she had incurred for violating the terms of her probation. In the context of contempt, we have stated that "[s]pending money on other bills or obligations does not absolve the failure to pay court-ordered child support. In fact, having the means to meet other financial obligations evidences an ability to pay child support." *Buttrey v. Buttrey*, No. M2007-00772-COA-R3-CV, 2008 WL 45525, at *2 (Tenn. Ct. App. Jan. 2, 2008) (contempt case); *see also Cisneros v. Cisneros*, No. M2013-00213-COA-R3-CV, 2015 WL 7720274, at *10 (Tenn. Ct. App. Nov. 25, 2015) ("Father's ability to work and the fact that he is able to meet other obligations indicate that he was able to pay the support when it was due.").

Mother never testified she was unable to make any contribution towards her child support obligations. *See In re Alexander J. G.*, M2013-02210-COA-R3-PT, 2014 WL 1877636, at *4 (Tenn. Ct. App. May 6, 2014) (holding abandonment by failure to support was established where mother provided no financial support for child and her testimony showed she received disability payments from which "she could have paid some support for her child"). Accordingly, we hold DCS established by clear and convincing evidence that Mother abandoned the children by willfully failing to pay support during the four-month period immediately preceding the filing of the termination petition.

3. Persistent Conditions

The ground of persistent conditions requires that DCS prove the following by clear and convincing evidence:

The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

(A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent or parents or the guardian or guardians, still persist;

(B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or parents or the guardian or guardians in the near future; and

(C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

Tenn. Code Ann. § 36-1-113(g)(3).

Mother argues that DCS has failed to prove this ground because the children were removed from her home due to allegations of her drug use, and the evidence showed she no longer tested positive for illegal drugs. To prove persistent conditions, it is not necessary that the same conditions exist at the time of trial as existed when the children were removed from their parents' care. *In re A.L.B.*, No. W2008-02696-COA-R3-PT, 2009 WL 1856023, at *8 (Tenn. Ct. App. June 30, 2009). Indeed, the language of the statute is unambiguous that persistent conditions are established if evidence shows the existence of conditions that led to the children's removal **or other conditions** that in all reasonable probability would lead to further abuse or neglect. Tenn. Code Ann. § 36-1-113(g)(3)(A). As the *A.L.B.* court found, the ground is proved through clear and convincing evidence of conditions showing that it is reasonably probable that the children would be subjected to further abuse and neglect if they were returned to their parent, regardless of whether the conditions are the same as when the children were removed or not. *In re A.L.B.*, 2009 WL 1856023, at *8.

The children have been removed from their parents' home for more than six months. As the trial court found, the proof was clear and convincing that at the time of trial, Mother did not have stable housing or employment, she was financially unstable and had failed to provide ongoing support for the children, and she had been sporadic in maintaining contact with the children. She was in violation of her probation requirements

- 23 -

and at risk of continued incarceration, which would expose the children to further neglect and a return to foster care. The evidence is clear and convincing that there was little likelihood that these conditions would be remedied at an early date so that the children could be safely returned to Mother in the near future. The continuation of the children's relationship with Mother greatly diminishes the children's chances of being placed into a safe, stable, and permanent home.[9]

For all of these reasons, we affirm the trial court's determination that DCS proved the ground of persistent conditions as to Mother by clear and convincing evidence.

D. Best Interest Analysis

Having found clear and convincing evidence exists to terminate Mother's and Father's parental rights, we next consider whether the trial court properly determined that termination is in the children's best interest. *See* Tenn. Code Ann. § 36-1-113(c)(2); *In re Audrey S.*, 182 S.W.3d at 860. "Facts relevant to a child's best interests need only be established by a preponderance of the evidence, although DCS must establish that the combined weight of the proven facts amounts to clear and convincing evidence that termination is in the child's best interests." *In re Carrington H.*, 483 S.W.3d at 535 (citing *In re Kaliyah*, 455 S.W.3d 533, 555 (Tenn. 2015)).

The factors a trial court is to consider in determining whether terminating a parent's rights to a child is in the child's best interest are set forth in Tenn. Code Ann. § 36-1-113(i) and include the following:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

---

[9]The children's foster parents both testified that they were interested in adopting the three children, and the evidence showed that the children were thriving in their foster home.

- 24 -

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

The trial court found terminating Mother's and Father's parental rights was in the children's best interest. The court wrote:

[Father] has been incarcerated all but four of the twenty-seven months that these children have been in foster care. He is now serving a ten year sentence with at least eight years remaining and there is no indication in [his] record that he will be eligible for parole sooner than August 2017. He also has pending criminal charges which may extend or add to his incarceration term. At the time of this hearing, [Father] is 39 years old. [Father] testified that he has been incarcerated for more than 16 years of his life. The court does not find it likely that [he] will change so as to provide a safe and stable environment for these children.

[Mother] and [Father] have not made changes in their conduct or circumstances that would make it safe for the children to go home. [Mother] . . . does not own or control a stable residence for the children. [Her] employment is found to be unstable and inconsistent. [Father] remains incarcerated.

The court finds that it is in the children's best interest for the termination to be granted as to [Mother]; because she has not made lasting changes in her

lifestyle or conduct after reasonable efforts by the State to assist her, the court finds that lasting change does not appear likely in the foreseeable future.

The court finds that it is in the best interest of the children for the termination to be granted as to both [Mother] and [Father], because they have not maintained regular visitation with the children. [Mother] has not visited with or called the children since May 25, 2015. And [Father] has not called the children and he has only sent two letters during the duration of their time in custody.

The court finds that it is in the children's best interest for termination to be granted as to [Father], because there is no meaningful relationship between him and the children. Since the children have entered custody on August 26, 2013, [Father] has not visited with the children and has not made substantial contact with the children.

The court finds that it is in the children's best interest for termination to be granted as to [Mother] and [Father], because there is crime in their home and crime is part of their lifestyle. [Father] has been in and out of jail for more than 16 years on various criminal charges, to the point where he cannot provide a suitable and/or stable home for his children due to his repeated incarcerations and ongoing criminal activity. [Mother] has also incurred additional criminal charges since the children entered custody following criminal events that led to their removal . . . . She remains inconsistent in her employment and has shown little interest in supporting her children. She has shown little interest in following the clearly mandated requirements to have her children returned to her. She has shown a total disdain for following the rules and requirements given her and continues to do so.

The court finds that it is in the children's best interest for termination to be granted because changing caregivers at this stage in their lives will have a detrimental effect on them. After visits with their mother, the children have exhibited numerous severe behavioral and emotional problems. The children need stability and structure in their lives and will need continued assistance in dealing with the trauma associated with [Mother's] inconsistency throughout the children's custodial episode and before.

The court finds that it is in the children's best interest for termination to be granted because [Mother] has not paid child support consistently. The only support that was paid prior to the filing of the Petition was a tax refund intercept. Since the filing of this proceeding, she has paid approximately

$300.00 by wage assignment with an employer that she no longer works for.

The record supports the trial court's findings, as set forth above, and we conclude that DCS has proven by clear and convincing evidence that terminating Mother's and Father's parental rights is in the children's best interest. In addition to the trial court's analysis, we note that one of the children reported being held down on a bed and choked by Father prior to the time the children were removed from their parents' house and that domestic abuse took place between Mother and Father in the children's presence. The children's clinical therapist testified that a report had been made to the child abuse hotline that the middle child had been choked by Father on a bed and that a window had been broken out in the front of the house as a result of something being thrown from the house by Mother or Father during a fight.

When asked how the children interact with the foster parents, the therapist testified that they have a positive relationship with the foster parents; that the children "trust them and work well with them and respect them." The therapist testified that the children needed stability and consistency in their lives. She explained that their behavior would deteriorate and they would begin hitting, kicking, not listening, and fighting when Mother was not consistent with her visits or communication with them:

> [W]hen Mom would stop with visitation that's when the behaviors would start because of the instability of not having the consistency and not knowing and not having someone that could tell them when they were going to see or hear from her again.

The foster mother and foster father both testified that they loved the children as their own and would be willing to adopt them if given the opportunity.

For all of these reasons, we hold that termination of Mother's and Father's rights is in the children's best interest.

### III. Conclusion

The trial court's judgment is affirmed. Costs of appeal are assessed against the appellants, April L. T. and Chad T., for which execution shall issue if necessary.

_____
ANDY D. BENNETT, JUDGE